ALETHEA O'TOOLE
1308 E Colorado Blvd., #516
Pasadena, CA 91106
Phone Number: (323)286-1018
Email Address: a.otoole@live.com
Plaintiff In Pro Se

RDDJ

FILED

CLERK, U.S. DISTRICT COURT

05/24/2025

CENTRAL DISTRICT OF CALIFORNIA

BY _____GSA_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

N/S

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Alethea C. O'Toole<br><br>       Plaintiff,<br><br>   vs.<br><br>Nickelodeon Animation Studio, Inc., Nickelodeon Group, Paramount Global, ViacomCBS, Inc., National Amusements Inc., Netflix, TajMania Entertainment, Christopher M. Savino, Darryl "Scott" Haynes and Does 1-500<br><br>       Defendant(s) | ) Case No.: 2:25-cv-04849-ODW-(BFMx)<br>)<br>) SEEKING NATIONWIDE RELIEF<br>)<br>)<br>)<br>) VERIFIED SECOND AMENDED COMPLAINT FOR RELIEF, REMEDIES, AND DAMAGES CAUSED BY COPYRIGHT INFRINGEMENT, ACCOUNTING, INJUNCTION, AND ADDITIONAL CAUSES OF ACTION<br>)<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED** |

Plaintiff Alethea C. O'Toole alleges as follows:

1

# I.    JURISDICTION

1)    This is an action for copyright infringement pursuant to the Copyright Act, 17 U.S.C. §101 et seq. together with a claim of unfair competition.

2)    Plaintiff seeks an accounting and an injunction to prevent Defendants from their continuing conduct in unlawfully violating Plaintiff's rights.

# II.    VENUE

3)    Venue over this action in California is proper in this District pursuant to 28 U.S.C.  §1391 U.S. Code Unannotated Title 28 which establishes general venue over judiciary and judicial procedure in an action in any judicial district in the United States.

# III.    PARTIES

8) **Plaintiff Alethea C. O'Toole**: At all times hereinafter mentioned, Alethea C. O'Toole (herein "Plaintiff") is an individual residing at 1308 E Colorado Blvd. #516, Pasadena, CA 91106. Plaintiff is a talented writer and illustrator. She is the sole author and creator of a number of children's books featuring Plaintiff's text and Plaintiff's numerous original illustrations.  Plaintiff's works relevant to the claims herein include "The Pirates of Pizzan" (1998), "Max and Puppy: Max's Birthday" (2002), "Max and Puppy: Puppy's First Snow" (2003), "Muffin

Muncher: the Musical" (2004), "Live! With Truly" (2014) and "Westfield" (2014) (collectively, "the Works").

9) **Defendant Nickelodeon Animation Studio, Inc.:** Upon information and belief, at all times hereinafter mentioned (herein "Nickelodeon") is an American pay television channel specializing in children's entertainment and a division of Paramount Global, with its principal place of business as 231 W Olive Ave, Burbank, CA 91502.

10) **Defendant Nickelodeon Group:** Upon information and belief, at all times hereinafter mentioned, was an affiliate of Nickelodeon providing in-house animation for Nickelodeon with its principal place of business at 1515 Broadway, New York, New York.

11) **Defendant Paramount Global:** Upon information and belief, at all times hereinafter mentioned, (herein "Paramount Global") is an American multinational mass media and entertainment conglomerate with its principal place of business at 1515 Broadway, New York, New York.

12) **Defendant ViacomCBS, Inc.:** Upon information and belief, at all times hereinafter mentioned (herein "ViacomCBS") was a Delaware corporation and since has been acquired by National Amusements. ViacomCBS, Inc., has its principal place of business at 1515 Broadway, New York, New York.

ViacomCBS holds all copyrights for the credited shows and films umbrellaed under *The Loud House Franchise.*

13)    **Defendant National Amusements, Inc.:** Upon information and belief, at all times hereinafter mentioned (herein "National Amusements") is an American privately owned mass media conglomerate incorporated in Maryland and which owns Paramount Global, ViacomCBS, and Nickelodeon, and with its principal place of business at 846 University Avenue, Norwood, Massachusetts 02062-2631.

14)    **Defendant Netflix, Inc.-** Upon information and belief, at all times hereinafter mentioned, (herein "Netflix") is a California corporation currently located at 121 Albright Way, Los Gatos, California 95032.

15)    **Defendant TajMania Entertainment:** Upon information and belief, at all times hereinafter mentioned, TajMania Entertainment (herein "TajMania") is a partnership formed in 2009 consisting of Larry Juris, Howard Gimple, Samy Laskey, Tom Caggiano, and Emanuel "Manny" Reyes (herein, respectively, "Juris," "Gimple," "Laskey," "Caggiano," and "Reyes") with an address of 4475 Henry Hudson Parkway, Bronx, New York 10471, currently doing business at 3950 Blackstone Avenue, Bronx, NY 10471.

16)    **Defendant Christopher M. Savino:** Upon information and belief, at all times hereinafter mentioned, Christopher M. Savino (herein "Savino") currently lives at

4

1008 Queens Lake Trail., Mckinney TX 75071.  Savino was credited for creating
the animated series entitled *The Loud House* which airs on Paramount and
Nickelodeon.

17)    **Defendant Darryl "Scott" Haynes:** Upon information and belief, at all times
hereinafter mentioned (herein "Haynes") is an individual living at 106 S Kings
Road, Apt 301, Los Angeles, CA 90048.

## IV.    STATEMENT OF FACTS

18)    "That light we see is burning in my hall. How far that little candle throws his
beams! So shines a good deed in a naughty world. So doth the greater glory dim the
less." ~ Portia, William Shakespeare, The Merchant of Venice

19)    Ms. O'Toole has been writing short stories since she was a child. After she had
her son, Hunter J. O'Toole she began writing down literary works. Today she has
several scripts and short stories copyrighted with the copyright office. More
recently in 2021 she placed two scripts in a 24-hour script writing contest win won.

20)    Plaintiff is a creative writer whose works include *Prince of Pizzan, The Muffin
Muncher: The Musical, Max and Puppy, Live! With Truly*, and *Westfield*.
Defendants, without Plaintiff's authorization, permission or consent took
Plaintiff's copyrightable elements of theme, setting, character, time sequence,
pace, and total concept and feel and other elements which are protectable elements

5

of copyrighted work under the Copyright Act, 17 U.S.C.§ 101et seq. to produce a series of profitable television programs (starting with *The Loud House* and subsequent sequels and derivative productions) from which they made millions of dollars.

21)    In 1998 the Plaintiff created *Prince of Pizzan*, an illustrated story written and put down in tangible form for her son the year he was born. It has since been copyrighted with the U.S. Copyright Office.

22)    Around 2002 the Plaintiff created *Max and Puppy* from original bedtime stories she told her son. After encouragement from her son's father she began writing the stories down. The Plaintiff has a copyright application on file with the U.S. Copyright Office.

23)    From 2003-2007 the Plaintiff worked diligently to earn a double degree in Business Administration and Theatre Arts. In 2004 while attending the University of Hawaii-Hilo, the Plaintiff obtained permission from Penguin Group publishing house to adapt and direct *The Muffin Muncher* into a children's "theatrical adaption" which has been filed with the U.S. Copyright Office.

24)    In 2006 the Plaintiff attended New York University for a summer in film studies. In 2007 she graduated from the University of Hawaii-Hilo with a double degree in Business Administration and Performing Arts.

25)    In 2009 the Plaintiff moved to Los Angeles and settled in Pasadena, CA with her son. She began looking for work in the entertainment industry with hopes to produce and direct. Between 2009-2010 she became a member of the Women in Film. There she began making connections with Directors, Producers, and Writers.

26)    Around 2010 the Plaintiff submitted a pitch for a reality television game show called "Cache Cow" in conjunction with the Women in Film and MTV Entertainment Group a subsidary of Paramount Global. MTV was once owned by Viacom and headed by Bob Bakish the former CEO of both Viacom (2016-2019) and Paramount Global (2019-2024).

27)    In 2010 Plaintiff was interviewed as a contract worker for Corovan under The Walt Disney Corporation. The interview took place at the Disney Lot in Haynes' office. Haynes was the Facilities Manager who oversaw the contract between Corovan and Disney and facilitated non-union needs for Disney employees that worked at buildings as far reaching as the Disney Channel Building in Toluca Lake to Disneyland in Anaheim. The interview was held by Corovan's Reginal Manager Guillermo Argueta and included On-site Manager Carlos Velasco.

28)    The Plaintiff was offered the role by Corovan. At the time the Plaintiff worked as a subordinate to Haynes, who was in a principal-agent relationship between

Disney and the subagent Corovan. During this time Haynes pursued a personal relationship with the Plaintiff that continued for several years.

29)   Because of the personal nature of their relationship Haynes was privy to personal information of Plaintiff's and had direct access to Plaintiff's material. He was aware of the Plaintiff's career goals outside of her daily tasks. The Plaintiff shared some material with him, such as her cooking blog "Truly's Table," and articles she had written for an online news source. He had also seen various drawings she had illustrated including her storyboard illustrations for *Prince of Pizzan.*

30)   In the course of the relationship Haynes had personal interactions with Plaintiff's son Hunter J. O'Toole and was present in Plaintiff's life to the extent that Haynes took on the part of a step-father figure to her son.

31)   In November of 2011 the Plaintiff left Corovan to work in the Facilities Mailroom at the Disney Channel Building. The Plaintiff began "elevator pitching" executives at various Disney cable channels within the building. It was here, sometime between late November 2011-March of 2012, the Plaintiff met Chris Savino and pitched him *Max and Puppy*. Savino was the Director of the cartoon *Kick Buttowski* at Disney XD. He encouraged her to connect with other staff members at Disney XD. The Plaintiff did and gave a hardcopy to his colleagues

who said they would "pass it on to the Director who had the creative decision-making power."

32)   Around March 2012 the Plaintiff took a position as the Second Assistant to President of ABC Family in the Disney Channel building. During that time, she maintained the schedule for a shared conference room that was used by the entire building and had continued interactions with Disney XD.

33)   The end of 2012 Plaintiff took a position working for the VP of Corporate Controllership in Disney's Financial Planning and Analysis division. In this role she took on many responsibilities and worked with a vast number of other C+ executives. The Plaintiff continued to network and by 2013 she had been accepted into the "Disney's Writer's Group."

34)   In 2013 Chris Savino submits a short to Nickelodeon's Short's Program. The short consists of a of a "white rabbit" and becomes the first entry for what he is known to be credited for, *The Loud House Franchise.* Unbeknownst to the Plaintiff at the time, Savino leaves Disney after finishing his last project Mickey's "Bad Ear Day" around 2013.

35)    January 2014 Plaintiff created *Westfield.* She filed it with the WGA and later filed for copyright with the U.S. Copyright Office.

36)    March 2014 Plaintiff begins working on films for Blanc-Biehn Productions. Her son accompanies her and becomes part of the crew as well.

37)    2014 Nickelodeon announces they are developing Chris Savino's short into a future series. The short is a redeveloped 2.5-minute animated piece.

38)    In 2014 Disney had a restructuring and Plaintiff transitioned out over the next six months. It was around this time in 2014 that Plaintiff was unexpectedly approached by Howard Gimple, Chief Creative Officer and Writer, for TajMania Entertainment, a company with ties to Nickelodeon. The Plaintiff was contacted by TajMania via social media by Howard Gimple. The correspondence was unsolicited by Plaintiff who was unfamiliar with the company.

39)    TajMania Entertainment was composed of the following members: Larry Juris Owner, Howard Gimple Chief Creative Officer and Writer, Sam Laskey Writer, Tom Caggiano Cartoonist and illustrator, and Emanuel "Manny" Reyes Co-owner. The company promotes three of their scripts on its social media pages: *Oye Christina, Max Helsing*, and *Rescue Dogs*. (See EXHIBIT)

40)    Gimple explained that they were a "socially conscious children's animation company," and were interested in Plaintiff's ability to connect them to Disney. They claimed they had vast experience in the industry and had previously worked on large budget projects. He mentioned they would also be interested in seeing any work Plaintiff may have.

41)    The Plaintiff responded to Gimple's email, and he arranged a lunch meeting between the Plaintiff and his "business partner" in Los Angeles, Sam Laskey. After reviewing Plaintiff's material, TajMania Entertainment brings her aboard as VP, West Coast Representative and Creative Development. Plaintiff had a contract drawn up and it was agreed upon by all parties.

42)    Between 2014-2015 Plaintiff created *Live! With Truly* and sent copies to TajMania Entertainment. The Plaintiff also sent TajMania detailed character descriptions, merchandising concepts, visuals of character styles, and other pitching material that would aid in the future developments of the script.

43)     Days after receiving the drafted script, Howard Gimple wrote to the Plaintiff telling her the company was disbanding. In these emails he offered the rights of their scripts to Ms. O'Toole, and stated that, "Hollywood has hundreds of success stories where scripts that were started by one person and finished by others became big hits."

44)     It is with information and belief that between 2012-2014 TajMania Entertainment pitched multiple scripts to Nickelodeon who "passed after some initial interest."

45)     During the development of *Live! With Truly* Plaintiff sent a photo of her son Hunter and his friend to TajMania with the description "for the boys". The photo was meant to depict the two main male characters in *Live! With Truly.* Plaintiff had shown this to Haynes who knew of her intent to use the image of Hunter and his friend in the final product.



46)    While negotiating with TajMania Entertainment the Plaintiff had shared details of the business transactions with Haynes. Knowing that the Plaintiff was finishing her script Haynes, coerced, badgered, and berated her into sending him a copy so he "could give edits and feedback," all while leaving Ms. O'Toole under the pretense that they were in a long-term relationship.

47)    The first known rough draft image of the newly reworked *Loud House* is published by Variety Magazine. It depicts "Lincoln Loud" and his ten human sisters. In several publications Savino, who has been credited as the creator of *The Loud House*, stated that Jenna Boyd SVP, Animation Development at Nickelodeon who was helping Savino through the "Shorts" submission process suggested that the show would be more marketable to the Studio if it was created with "human" characters rather than "rabbits".



13

48)    The Plaintiff alleges that she recognized the images in the illustration drawing by Savino to have a striking resemblance to herself and her supervisors at Disney. Plaintiff claims that this was an intentional act in the process of reshaping the Plaintiff's work for profit for Nickelodeon Group and its parent companies.

49)    It is with belief that sometime on or around the summer of 2015 Nickelodeon purchases *The Loud House* from Chris Savino and the first "sneak-peek" is featured in San Diego at Comic-Con the summer of 2015.

50)    "On September 29, 2016, National Amusements, the parent company of CBS Corporation and Viacom, wrote to Viacom and CBS Corporation encouraging the two companies to merge back into one company… In October 2016, Viacom

named Bakish as acting president and CEO of Viacom and Viacom Global entertainment Group.

51)     May 2016 *The Loud House* premiers on Nickelodeon. Shortly after Nickelodeon commits an infringement within an infringement when executives feature Chris Savino playing himself and promoted *The Loud House* on *All in with Cam Newton,* a show found to have been illegally produced by ViacomCBS and broadcast on Nickelodeon.

52)     According to Wikipedia, "[i]n early 2017, Bakish laid out a five-point plan to return Viacom to producing a steady profit. This consisted of focusing on Viacom's six flagship brands: BET, Comedy Central, MTV, Nickelodeon, Nick Jr. and Paramount.

53)     2017 Variety Magazine collaborates with Nickelodeon for the third straight year and features "Animators to Watch" unveiling special addition covers with exclusive *Loud House* artwork. The head editor of Variety Magazine Tim Gray is close personal friends of Haynes and his wife, who worked on his book.

54)     2017 Chris Savino is fired by National Amusements et al after sexual harassment allegations arise, and he faces charges before the Animation Guild. Below is a statement by Chris Savino from an interview he did in 2023 with Cross Politics.





55)    2017-2019 the Plaintiff begins receiving harassing emails from Haynes. The

emails include content of an extortive nature while Haynes aggressively states that

his "Disney contacts have shown me how to change enough copyrights that you

can't be attached. Kick Rocks!!!!"

16

56)    On or around 2017 Haynes and his wife become part of Lower Depths Theater. On or around 2018 the Haynes's attend a poker night for Lower Depths Theater and attendees bid on their "Gift Wall" a story board of topics of interest for future productions. The topics include sex trafficking and Honor Killing.

57)    "On March 30, 2018, CBS Corporation made a play to buy Viacom and merge them back into one company and that Bob Bakish be maintained as president and COO…These conflicts had resulted from Shari Redstone, [now owner of National Amusements], seeking more control over CBS Corporation and its leadership... Eventually, on May 14, 2018, CBS Corporation sued its and Viacom's parent company National Amusements and accused Redstone of abusing her voting power in the company and forcing a merger that was not supported by it or Viacom."

58)    2018 Later that June, Bakish announced that Viacom [would] produce some new series exclusively for Netflix, beginning with Nickelodeon-related content.

59)    On January 18, 2019, and February 5, 2019, Bob Bakish announced that *The Loud House Movie* was being pulled from theater schedules and moved to Netflix.

60)    On February 5, 2019, it was announced by Viacom CEO Bob Bakish that the [*Loud House Movie*] would be released on the streaming service Netflix. In 2017 Paramount Global established that "Paramount Pictures was originally going to

release the film [in 2020 through Paramount] but was pulled from its schedule. Nickelodeon Movies then signed a deal with Netflix to have the film distributed on their service. Produced by Nickelodeon Movies, with animation done overseas. [I]t was released worldwide in August 2021 by Netflix.

61)    March 2019 Ms. O'Toole leaves LA and moves back to Michigan. Haynes continues to send harassing emails. Haynes states he had informal talks with Netflix and HBO. He begins to make threats that he is "sending my Detroit boys to give you a proper home welcoming", statements he made money from the Plaintiff's scripts, statements he was "off to London to make a deal," followed by photos of thousands of dollars spread out on a bed tell me to "hit him up if you need aid", and that he was selling written pornographic material. He sends the Plaintiff a seven-page scene of a stripper being sexually and physicals abused by a male patron.

62)    April 2019 Broadway World publishes an article that T. Tara Turk-Haynes has been commissioned to study out and write a play on the topic of Honor Killing.

63)    On August 2, 2019, it was agreed that Bob Bakish would serve as CEO of the combined company with the president and acting CEO of CBS Corporation, Joseph Ianniello, overseeing CBS Corporation-branded assets. On August 7, 2019, CBS and Viacom separately reported their quarterly earnings.

64)    On August 13, 2019, CBS and Viacom officially announced their merger; the combined company was to be named ViacomCBS, with Shari Redstone serving as chair. Upon the merger agreement, Viacom and CBS jointly announced that the transaction was expected to close by the end of 2019, pending regulatory and shareholder approvals. The merger required approval by the Federal Trade Commission (FTC).

65)    The June 2019 the first draft of the script for *The Loud House Movie* was written. In published statements Bob Bakish, CEO of Viacom, announces the movie will be pulled from theaters and enters into a contract with Netflix.

66)    On October 14, 2019 the spin-off show *The Casagrandes* was released by Nickelodeon and Paramount Plus and ran till February 2022.

67)    Bakish retained the role of CEO when CBS Corporation and Viacom reunited under a single company to form Paramount Global (then known as ViacomCBS), which closed on December 4, 2019.

68)    On December 10, 2019, days after the merger, Bakish announced that ViacomCBS would look to divest Black Rock, the building that held CBS's headquarters since 1964. He stated, "Black Rock is not an asset we need to own, and we believe that money would be put to better use elsewhere."

69)    January 2021 Bob Bakish announced the launch of the newly rebranded Paramount Plus platform that would be streaming material as of March 2021 and would release hundreds of video titles throughout the month of August to promote the platform.

70)    The *Loud House Movie* is announced to be released in April 2021. But in later announcements the *Loud House Movie* release date is set for summer 2021.

71)    July 2021 the Plaintiff purchases her first independent television channel and starts preparing to launch *The Experience* with new content.

72)    August 20th, 2021, *The Loud House Movie* is released on Netflix.



73)    August 20th, 2021, Nickelodeon released *Paw Patrol* in theaters and Paramount Plus simultaneously worldwide.

74)    August 20th, 2021, Nickelodeon released *Clifford the Big Red Dog* in theaters and Paramount Plus simultaneously worldwide.

75)     August 20th, 2021, Bob Bakish announces that, via ViacomCBS, he is
partnering with FOX to relaunch CBS/FOX Video once headquartered in Livonia,
MI.

76)     November 2021 Nickelodeon and Paramount+ release *A Loud House Christmas*
movie across their streaming platforms. It is on information and belief that *The
Really Loud House Christmas* is a direct infringement of Plaintiff's work. This film
was followed by the release of the second spinoff show *The Really Loud House*
(2022) which continues to be broadcast on Nickelodeon and streams on Paramount
Plus.

77)     November 2021, Plaintiff is hired by an accounting firm in Los Angeles and
moves back in January 2022.

78)     February 2022, the spin-off show *The Casagrandes* is cancelled.

79)     March 2022 the Plaintiff moves into her downtown Los Angeles apartment
owned and operated by a Delaware Corporation.

80)     On or around May of 2022 the Plaintiff Ms. O'Toole became part of the cast
and crew for *Hip Hop Circus* where she began writing, working on production, and
helping with casting.

81)     On or around June 2022 the Plaintiff Ms. O'Toole begins receiving text
messages from a man she later identifies as Haynes. The texts are sexual in nature
and explicit. They later include photos and videos of a sexual nature.

82)    On or around July of 2022 Plaintiff's keys go missing and she spends several nights out of her home. When she returns her closet door is broken.

83)    On or around August or September of 2022 the PLAINTIFF was meeting with Directors and various *Artists* in preparation for the scheduled launch of her first television channel at the end of the year.

84)    In October 2022 Haynes emails the Plaintiff Alethea O'Toole stating, "thought I was you," and that he had seen her in Los Angeles. Haynes goes on to say he and Lucy Magana, a former coworker of his and Plaintiff's, knew where she lived and later sends a threatening letter to her home in DTLA.

85)    By November 2022 the "anonymous" texter had been identified by the Plaintiff as being Haynes. His text messages became explicit, attempting to lay groundwork to convince Plaintiff into having a relationship, into allowing him access to her phone's contact list, and by attempting to gain the Plaintiff's permission to enter her apartment.

86)    One evening the Director of *Hip Hop Circus* scheduled an impromptu writers' meeting interrupting potential plans between Plaintiff and Haynes. The next morning Plaintiff receives jealous angry text messages from Hayes for not allowing him to send his friend to Plaintiff's apartment. Within three days' time the Plaintiff received messages from Sean Cook, Director of *Hip Hop Circus,* that

he was in the hospital with a headshot wound, but was lucky, and recovering in the hospital.

87)    November 2022, witnesses identify Haynes at a bar across the street from her apartment. He and his wife are later identified in and around her building on several occasions. Although Plaintiff notified the building manager of her situation she found that the camera on her floor consistently started to go out. Other strange things started to occur.

88)    By 2023 Plaintiff files a restraining order against Haynes asking the court to hold passports. No server was able to serve the summons in person. Plaintiff was granted Continuance by the court; however, Mr. and Mrs. Haynes boarded a plane for the UK the morning of the next court date. When Plaintiff returned home and checked the mail, she found a handwritten letter had been delivered to her home. The contents were vulgar, and inferred Haynes was influencing judges. It stated, "But now I know where you live, I will be sure post your pictures around DTLA," and "I took some screenshots from Scott's phone and your Pussy looks so beat up. I plan to share them with folks ~~and~~ at Disney and other studios. By next week you will be famous," and continued to hatefully call Plaintiff "poor white trash." It was signed "Love, Lucy."

89)    In 2024 Plaintiff began preparing pleadings and evidence related to the controversy at hand at Chrysalis in Downtown Los Angeles located at 522 Main

St., Los Angeles, California, and is located at the cross street of Los Angeles and 6th and around the corner from Plaintiff's apartment in DTLA which was located at 121 N. 6th Street, #510, Los Angeles, California.

90)    While compiling evidence at Chrysalis, the Plaintiff discovers that Paramount, Nickelodeon, Netflix, and Defendants named herein developed two new *Loud House Franchise* films set to release 2024; *The Casagrandes Movie* released March 22, 2024 on or around Plaintiff's enrollment date with Chrysalis (Distributed by Netflix); and *No Time to Spy: A Loud House Movie* released June 21st, 2024 on Paramount Plus.

91)    She also discovered the existence of Nickelodeon's live action version of *The Loud House* entitled *The Really Loud House* November 2022, through November 2024. Plaintiff also found *A Really Haunted Loud House Movie* released September 28, 2023. The plaintiff alleges that the influence caused by the actions of creating and cancelling these shows, by any and all parties involved, have a great impact on the lives of cast, crew, and staff of such projects.

92)    The Plaintiff goes on to assert that this fluctuation is a mass manipulation of profits, benefits, and markets in which they directly impact for benefit and profit both influencing national and international markets of trade and financial instruments. The Plaintiff asserts that it is the infringement itself that creates there uncertain markets by the studio and the infringing benefacting parties whether they

were vicarious or not. And further asserts that these uncertain markets have created a great disappearance between market values.

93)     Between September 2024 – November 2024, and amid the time the Plaintiff contacted Chrysalis, Defendant Larry Juris and DEFENDANT D. Scott Haynes unexpectedly contacted the PLAINTIFF via LinkedIn. They both attempted to contact her through a LinkedIn account that is unused and associated with a new email address. The PLAINTIFF has not been contacted by DEFENDANT Larry Juris for 10 years.

94)     Around October 2024 the Plaintiff discovers three things after compiling court pleadings at Chrysalis's computer lab in downtown LA:

95)     Unknown public patrons from Chrysalis had uploaded their personal information into the Plaintiff's Microsoft One Drive.

96)     The Plaintiff was missing files from her Microsoft One Drive that held evidence in it pertaining to the controversy at hand.

97)     Chrysalis is financially sponsored by and partnered with Netflix, Disney Resorts, and EY among others.

98)     March 2024 the Plaintiff begins working on her evidence at Chrysalis, a company that fosters employment in DTLA. While compiling her case the Plaintiff realized that her online drive had been compromised by individuals accessing her information via Chrysalis's computer lab. Around this time the Plaintiff also

discovered that her online files had been infiltrated, and evidence was deleted. She learned that Chrysalis is sponsored by Netflix and Disney Resorts and works with volunteers from theater groups who have close ties with Haynes and his wife T. Tara Turk-Haynes, a playwright.

99)    In 2024, Nickelodeon Animation / National Amusements et al released the following: *The Casagrandes Movie*, *No Time to Spy: A Loud House Movie,* and four new episodes of the *Loud House* series.

100)   November 12, 2024 Nickelodeon premieres three new episodes of *The Loud House* series: "Kara-less Whisper/Dollars and Scents", "Bulking and Sulking", and "Wild Goss Chase."

101)   September 2024 Haynes reaches out to Plaintiff via a new LinkedIn account.

102)   On around a month later in 2024 Larry Juris, owner of TajMania Entertainment, sends Plaintiff a connection request through LinkedIn.

103)   May 6th, 2025 Plaintiff sends out Demand Letters to Paramount, Nickelodeon, Netflix, and National Amusements. Additionally, Plaintiff hires a mediator to contact the above-listed parties and offer an opportunity for mediation and negotiation in leu of taking up the court's time and resources. To this day her requests have gone unanswered. The Plaintiff alleges that the parties had ample time to respond and learn more about the controversy at hand.

104)  May 19th, 2025 – May 23rd, 2025 Plaintiff finds that her online files are being accessed without her permission. To minimize damage to Plaintiff's property and proprietary information, Plaintiff minimized internet access; however, in the limited time that she did access the internet, the Cyber attackers accessed over 35 files pertaining to this court case including exhibits Plaintiff had prepared.

105)  It is on information and belief that ViacomCBS holds all the copyrights for the entirety of the *Loud House Franchise.* And that all three shows, and five films are currently airing on Paramount Plus, Nickelodeon's international broadcasting outlets and/or Netflix.

106)  The Plaintiff alleges that Mr. Savino, Haynes and TajMania were the only ones with access to all the Plaintiff's works besides herself. The Plaintiff continues to allege that those parties and/or other Does knowing or vicariously shared that information with other individuals who perpetuated the systemic illegal copyrighting actions.

107)  The Plaintiff states that the element of originality is displayed in her copyrighted work noted herein as original and fixed; and that Nickelodeon Animation et al, Netflix, TajMania Entertainment and Defendants named herein, took great care to replicate the elements of the original work into the film *The Loud House Movie.*

108)   And that copyright elements are not just present in *The Loud House Movie* but

are present throughout the entire *Loud House Franchise* as derivatives of the

infringee's tangible works: *Prince of Pizzan, The Muffin Muncher: The Musical,*

*Live! with Truly, Max and Puppy,* and *Westfield.*

109)   The copying and similarities between Plaintiff's works and Defendants'

copyright infringing productions are numerous and extensive.  The Defendants'

*Loud House Movie* production follows the storyline of Plaintiff's *Prince of Pizzan*

storyboard illustrations in settings, style, character, theme, and overall look and

feel. Defendants' production also has lines from the story itself incorporated in the

production. The story incorporates a dragon who is one of the main characters of

both *Prince of Pizzan* and *The Muffin Muncher*. Plaintiff will submit extensive

analysis with examples of Defendants' unlawful copying from Plaintiff's original,

copyrighted works.

**INVASION OF PRIVACY / RIGHT OF PUBLICITY**

110)   Plaintiff alleges that Paramount, ViacomCBS, Nickelodeon, Netflix, TajMania,

Defends, and Does took great care not just to illegally copyright Plaintiff's work,

but also to infiltrate her life on many personal levels. Following the habits of

Plaintiff, her friends, and family through social media.

111)   Plaintiff alleges that the photos, images, likeness, names, and character traits were introduced into the *Loud House Franchise* material, with intention, for the development of characters, character traits, storyline developments, situations, themes, and over all look and feel. Section §652 of the Restatement (Second) of Torts (1977) states "that Appropriation of Name or Likeness as 'One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy,'" (Kirby v. Sega of Am., Inc., 144 Cal. App. 4th 47 (2006)).

112)   The elements of a common law action resulting from illegal use of Publicity Rights are defined as the unauthorized use of Plaintiff's identity to the Defendant's advantage by appropriating the Plaintiff's name, voice, likeness, etc., commercially or otherwise, and resulting injury.

113)   Plaintiff states that her social media was targeted by litigants and/or Does both named and not named herein. And that intentional actions took place to use the photos, images, likenesses and name sakes found on the Plaintiff's social media which came to resemble themes, settings, characters, time sequences, pace, and total concept and feel.

114)   These photos, images, likenesses and name sakes of Plaintiff, her son, her friends, her family members, and/or former supervisors were used for the purpose of profiting, ultimately to National Amusements via equity, acquired through

Paramount and ViacomCBS while Shari Redstone, Owner of National Amusements, was sitting CEO and Board of Directors member over Paramount and ViacomCBS and had both voting power as well as final approval over large contact changes such as the one that occurred between Netflix and Nickelodeon via Bob Bakish for *The Loud House Franchise.*



EXHIBIT 16 Plaintiff's Walt Disney Co. Supervisors                                213



EXHIBIT 16 Plaintiff's Walt Disney Co. Supervisors                                214

115)   At *no time* did Plaintiff grant permission to any entity or individual, for use of the name, image or personal expression, of the Plaintiff, her son, her friends, her family members, or any images posted by her on any social media platform.

116)   At *no time* did Plaintiff grant permission to any entity or individual, for use of proprietary information in the *Loud House Franchise,* for profit or otherwise.

117)   From the detail, quantity and direct relation of characters, character traits, settings and themes used in the development, publishing and worldwide distribution of *The Loud House Franchise,* to the litigants named herein the complaint the Plaintiff believes these actions were done directly, indirectly, intentionally, contributory, vicariously and/or with deceitful intentions.

118)   The Plaintiff found that most of the images used from her social media were photos she posted between 2014-2015 on her social media. However, there were others that were sent privately to litigants which the Plaintiff also identified as a direct violation of Publicity Rights.

119)   The following are some of the Plaintiff's personal images that were discovered as themes, settings, characters, time sequences, pace, and total concept and feel and/or within the *Loud House Franchise.*

a)   Plaintiff reimaged as "Luan Loud" with her braces (Above). And Plaintiff at the age of two (Below) in Livonia, Michigan (Left) and *The Loud House* main

character "Lana Loud" (Right). The Plaintiff believes that she was intentionally depicted in defamatory ways in many instances.

Nickelodeon: *The Loud House*
Luan Loud (Main Character)

The Plaintiff: Alethea O'Toole





EXHIBIT I-2 Plaitiff, Alethea O'Toole

b)



120)  Plaintiff's son Hunter Jordan, reimaged as "Boy Jordan" and used in various episodes for profit by Nickelodeon et al.

Nickelodeon: *The Loud House*
"Boy Jordan" (Minor Character)

The Plaintiff: Hunter Jordan O'Toole
Facebook (2015)




121)   There is an extended statutory time period for Right of Publicity claims in
California. Plaintiff has a post-mortem right under Cal. Civ. Code Section 3344.1
to bring a claim on behalf of a deceased person's likeness for another 70 years after
their death. Therefore, the use of Rights of Publicity extends to the use of the
Plaintiff's biological father who has since past and whose photos, images, name
and/or his likeness have been recreated as the grandfather to *The Loud Family.*
(See Exhibit)

122)   Lastly Plaintiff alleges that there are many characters that have been created in
*The Loud House* from the photos, images, likeness, or name of litigants named
herein, namely Darryl "Scott" Haynes, his wife T. Tara Turk-Haynes, Larry Juris,
his wife Barabra Juris, Howard Gimple, his wife Christine Johnson, Sam Laskey,
and his wife Rebbeca Gimple, as well as Does not named as Defendants at this
time.

33



Darryl Scott Haynes
Elementary school picture



Clyde McBride

EXHIBIT - I-5                                                                50

## V.    CLAIMS

123)  **Claim #1 Copyright Infringement** – Plaintiff repeats and realleges each of the

foregoing paragraphs as if fully set forth herein.

124)  The Plaintiff asks the court that the "Entire controversy doctrine" be recognized

in this Intellectual Property case under the Copyright Act, for multiple

infringements of the Plaintiff's work that were developed into what is now known

as *The Loud House Franchise.* And thus, under this umbrella 17 U.S. Code § 501

Infringement of copyright; the claim asserts that the Copyright Act lays claims for

relief, remedies, and damages under the Lanham Act (including Unfair

Competition & Trademarks), and the Sherman Act (including Antitrust claims).

125)  17 U.S.C. § 106 The exclusive right to copy - This is an action for the exclusive

right to copy pursuant to copyright infringement laws subject to the Copyright Act,

34

17 U.S.C. § 101 et seq. for the Plaintiff's original works titled *Max and Puppy, Prince of Pizzan, Live! With Truly*, and *Westfield.* The court recognizes the holding of trademark and patents over copyright arms as it applies to a "communicative product that is a product that is valued not primarily for its physical qualities such as a hammer, but for the intellectual content that it conveys such as a book or…a video." (Dastar Corp. V. Twentieth Century Fox Film Cor., 2003). And as such works were authored solely by the Plaintiff and filed with the copyright office the author has the exclusive rights set forth in actionable elements including: "total concept and feel, theme, characters, plot, sequence, pace and setting" and that these are present in *The Loud House Movie,* as well as the series which is the basis for the movie. Copyright Interests - Derivative Work (17 U.S.C. §§ 101, 106(2)).

126)   17 U.S. Code § 201 Ownership of copyright - Validity: "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright 17 U.S.C. § 410(c).

127)   PLAINTIFF claims that multiple original works were pilfered by the DEFENDANTS and were used in the plagiarizing process of selling, globally distributing and developing these works into one animated work titled the *Loud House*. And furthermore, that the Plaintiff's original works were sold, globally distributed and developed by the Defendants as "spin-off" shows titled the

*Casagrande Family* (2019-2022) and *The Really Loud House* (2022-Current)*, and as films in the following titles: *The Loud House Movie* (August 2021-Current)*, The Loud House Christmas* (November 2021)*, The Really Haunted Loud House* (2023)*, and *The Casagrandes Movie* (2024), *No Time to Spy: A Loud House Movie* (2024).

128)  The Plaintiff asserts that the National Amusements, Nickelodeon and Defendants factually copied original expressions of the works listed herein the complaint without the owner's permission. That Mr. Savino, Haynes and TajMania Entertainment had access to Plaintiff's works, and that both probative similarities, and substantial similarities were expressed in elements introduced into *The Loud House Franchise*, were published, televised, and distributed by National Amusements et al and Netflix. The Plaintiff claims that the infringement is apparent when applying the "ordinary observer" test and that these infringements are substantial to the over-all work being sold as *The Loud House*, and thus should be actionable by law, and applicable to *The Loud House Movie* (2021-Current).

129)  The Plaintiff also claims that as the author she has exclusive rights over infringements incurred by secondary transmission. In this case of the film, secondary transmissions were released on Netflix through a deal made by Paramount Global and ViacomCBS to transmit *The Loud House Movie* which has not seen its last act and is still being transmitted by such secondary providers.

130)   17 U.S.C. § 102(a)(b)) - Subject Matter Ideas and Expression. The World Trade

Organization defines intellectual property and intellectual property rights as,

"given to persons over the creations of their minds." It is from the "creation of the

mind," or "human intellect," that all intellectual property is created from inception

in its original state. In this way one cannot diverge the creation of the mind from an

idea or concept, and thus creations can be easily adapted, manipulated, changed,

and redeveloped. In this case the Defendants used the heart of creation in pieces,

parcels and illustrations of Ms. O'Toole literary and illustrated creations and

fabricated them into works they labeled as *The Loud House Franchise.*

131)   The Plaintiff asserts that laws set forth in the Digital Millennium Copyright Act

of 1998 also apply. The act amends title 17, United States Code, of The

Performances and Phonograms Treaty, providing additional protection and

heightens the penalties for copyright infringement on the Internet.

132)   17 U.S.C. § 201(d)(1) Copyright Interests: Assignee, 17 U.S. Code § 204

Execution of Transfers of Copyright Ownership. The Plaintiff does not claim to be

the author of the titles *Oye Christina, Max Helsing,* or *Rescue Dogs*; instead the

Plaintiff claims the copyright by virtue of an exclusive license for the material and

that Ms. O'Toole is now the exclusive licensee of the copyright (Exclusive

Licensee 17 U.S.C. § 201(d)(2))). Such was the case with TajMania Entertainment

when Howard Gimple by written communication, assigned the rights of their

scripts to the Plaintiff. Furthermore, the Plaintiff has identified that elements of those titles have been incorporated into *The Casagrandes* spin off series and *The Loud House Franchise* in general.

133)   The Plaintiff recognizes this spin off show to be based on one of the Plaintiff's original characters and rights of ownership transferred to her by TajMania Entertainment for their script *Oye Christina.* The Plaintiff claims the creator's vested exclusive rights for the above title were transferred to her when the National Amusements fraudulently claimed they were abandoning all National Amusements projects. The same elements of copyright originality and fixation are present in, and *The Casagrandes Movie* (2024) which was also released on Netflix.

134)   **Claim #2 Negligence** – Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

135)   The Plaintiff claims that the litigants named herein continued to breach their duty through careless actions that negated reasonable care, and instead defrauded the federal system by recreating, reenacting, redeveloping, and distributing the illegal and illicit, wrongful copyright acts, and that these actions have led to grave negligence on the part of the National Amusements, Paramount Group, Nickelodeon, Netflix and Defendants; culminating in injury, damages and grievance to the Plaintiff Ms. O'Toole and her son Hunter O'Toole.

136)   The Plaintiff claims that these actions were not only foreseeable but would never have taken place without the direct involvement of the National Amusements, Paramount Group, Nickelodeon, Netflix, and Defendants. And that one can conclude from the way access was gained to Plaintiff's works, that it was an intentional act not one of accident or coincidence.

137)   In light of the National Amusements, Paramount Group, Nickelodeon, Netflix and Defendants knowledge, experience and industry persuasion, it is egregiously neglectful to have involved themselves this deeply in such proximate cause by means through which acts and omissions took place in infringing on the PLAINTIFF'S work so heinously.

138)   TajMania Entertainment used negligent business practices to enter into agreements with Nickelodeon Animation et al and/or Defendants named herein.

139)   Variety Magazine used negligent business practices while entering into agreements with, and following stories about; Nickelodeon, Chris Savino, *The Loud House*, Nickelodeon's Shorts Program, and other related information.

140)   **Claim #3 Willful Infringement** – PLAINTIFF repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

141)   As a Direct Infringer National Amusements / Nickelodeon Animation et al used the illegally produced *All in with Cam Newton* to promote *The Loud House* on their network as Chris Savino's new original work.

142)  As a Direct Infringer National Amusements / Nickelodeon Animation et al used willful intent to allow Chris Savino and other writers, directors, and executives to develop, promote, distribute, and make financial profits from *The Loud House* on their network developed from the Plaintiff's original literary and illustrated works.

143)  As a Direct Infringer TajMania Entertainment et al and Darryl "Haynes" Haynes used willful intent to gain access to, develop, promote, distribute, and make financial profits from *The Loud House* which was created from the Plaintiff's original literary and illustrated works.

144)  **Claim #4 Unfair Competition / Fair Use –** Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

145)  The claim asserts that National Amusements et al is a monopoly National Amusements that has used means of unfair competition to recreate material and goods without fair use. Furthermore, that they targeted and used employees of the competitor to gain access to and infringe on protectable works all while exploiting antitrust clauses.

146)  **Claim #5 Collusion / Civil Conspiracy –** Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

147)   National Amusements / Nickelodeon Animation et al collaborate with individuals and third parties to access, develop, distribute and profit from the Plaintiff's original copyright protected works.

148)   The Plaintiff claims that Haynes participated in the conspiracy by entering into an agreement with Nickelodeon, Chris Savino, and/or TajMania Entertainment with intent to profit from and use the Plaintiff's material without her consent.

149)   The Plaintiff claims that TajMania Entertainment and all of its members participated in the conspiracy with fraudulent intent to profit from copyright infringement and use the Plaintiff's material without her consent.

150)   The Plaintiff claims that Netflix entered into this conspiracy by direct, indirect or vicarious means and has profited from the Plaintiff's protected material.

151)   The Plaintiff claims that Chrysalis involved themselves in the civil conspiracy beginning in 2024 when the Plaintiff began assembling the evidence and complaint at their computer lab. And that Chrysalis leveraged their business relationship with Netflix (one of their major sponsors) and/or Haynes, by providing privileged information and/or access to the Plaintiff's files and intent to sue causing spoilage.

152)   **Claim #6 Breach of Contract –** Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

153)   The Plaintiff claims that Chris Savino entered into an implied and verbal contract when he accepted Ms. O'Toole's work, taking it into his possession and broke that contract by utilizing it without her permission.

154)   The Plaintiff claims that Darryl "Haynes" Haynes entered into an implied and verbal contract when he took Ms. O'Toole's work into his possession and broke that contract by utilizing it without the Plaintiff's permission.

155)   The Plaintiff claims that TajMania Entertainment entered into a written business contract when they requested to see Ms. O'Toole's works taking them into their possession intending to sell them for profit and broke that contract by utilizing those works without the Plaintiff's permission.

156)   **Claim #7 Extortion –** Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

157)   Plaintiff claims that Haynes used extortive means to gain access the Plaintiff's work. That he used the material to benefit himself by means of monetary compensation, financial instruments, gifts, memberships, favors, and/or other means including status, title, and promotion.

158)   The Plaintiff claims that TajMania Entertainment and its members used fraudulent and extortive means to gain access to Ms. O'Toole's works, and that those works were used for financial benefits.

159)  **Claim #8 Right of Publicity / Invasion of Privacy –** Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

160)  The Plaintiff claims that National Amusements / Nickelodeon Animation et al, Haynes and TajMania Entertainment all had access to and infiltrated her life through means of social media and used the photos, images, name, and likeness of herself, her son, her friends and family, and former supervisors to create characters that are used in the of *The Loud House Franchise.*

161)  **Claim #9 Alter Ego / Corporate Responsibility –** Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

162)  The Plaintiff asserts that Bob Bakish and Shari Redstone made personal decisions related to the infringement, and that their positions related to National Amusements et al are such that cannot be separated from those of the corporation.

163)  The Plaintiff claims that Shari Redstone was born into the business and has vast experience in corporate law, the laws surrounding copyright, and of the corporate responsibilities laid out before her. The Plaintiff further asserts these egregious and heinous actions were foreseeable, avoidable, and have pierced the corporate veil.

## VI.    REQUEST FOR RELIEF

164)  The Plaintiff is inclined to request a statement of entitlement for relief in the following areas designated by the Federal Court as proper forms of damages, remedy and relief as follows:

165)  Attorney's fees: The Plaintiff reserves the right to request the Defendants herein this claim pay for attorney's fees in the case that the Plaintiff is able to find proper legal representation to assist her in the proceedings before the Court, at a rate they deem appropriate.

166)  Request for accounting.

167)  Injunction Relief: The claim asks the court for injunctive relief in accordance with 15 U.S. Code § 1125 (c)(1))) dilution by blurring and dilution by tarnishment, Rule 65 of the Federal Rules and Civil Procedure.

168)  The Plaintiff claims that Rule 65 applies to permanent injunction relief on the grounds that: the Plaintiff will suffer irreparable injury; that no remedy available at law could adequately remedy that injury; the balance of hardship tips in the favor of the Plaintiff.

169)  Cancellation of registered copyright: The claims request the Court to relieve the Plaintiff of aggrievance by seeking cancellation of the copyright registration held by ViacomCBS on behalf of Nickelodeon and *The Loud House Franchise* material copywrites held therein.

170)   Supplemental Jurisdiction: This claim of controversy and matters stated herein are "so related to [the copyright] claims in the action…that they form part of the same case of controversy under Article III of the Untied States Constitution," (28 U.S.C.A. §1367).

171)   Equitable tolling - Fraudulent concealment and equitable estoppel: The claim requests the Court acknowledge that equitable tolling occurred on the part of Defendants, thus attempting to conceal the egregious actions within the controversy and/or participant(s) misconduct. The Plaintiff asserts that this unfathomable misconduct was continually sustained the entire period leading up to the preceding filing. (Jaso v The Coca Cola National Amusements 435 Fed, (5th cir. 2011)

172)   The Plaintiff also requests a Lulling agreement to be writing by the Plaintiff as she found traces of lulling actions and has yet been able to fully explore all the infringements that have actually occurred. In the spirit of accounting for actuals, the Plaintiff requests the lulling extend for time and access to inspect warehouses at any and all locations deemed suitably connected to this controversy.

173)   Request for investigation for the following civil code: Copyright Infringement - Criminal offenses: 17 USC 506: Any person who infringes a copyright willfully shall be punished as provided under section 2319 of title 18, United States Code.

174)   A public statement of apology on behalf of the Infringing parties to the Plaintiff admitting their involvement in the infringement and apologizing to her and her family for the affects their interference in the copyright infringement had on them.

**Damages**

175)   Under the Copyright Act Code the Plaintiff has the right to the following monetary Damages: Statutory damages §504(c) or Actual damages and Defendants Profits and the infringer's profits §504(a)–(c), Innocent Infringement §504(c)(2).

176)   Actual Damages: Under the Copyright Act U.S.C. the Plaintiff has the right to actual damages incurred, accrued and profited by the DEFENDANTS and their does named herein the complaint. Pursuant the actions for actual damages the PLAINTIFF is suing in the amount to be determined at the time of trial.

177)   Treble Damages: the PLAINTIFF requests the court to award treble damages for the heinous actions of willful infringement used in this controversy. Willful Infringement (17 U.S.C. § 504(c)(2)) "a finding of 'willfulness' . . . can be based on either 'intentional' behavior, or merely 'reckless' behavior."

178)   Damages associated with Civil Conspiracy for monetary damages associated with a Plaintiff's loss of earning capacity in an amount to be determined at trial.

179)   The United States Supreme Court addresses actual damages in the case of a PLAINTIFF'S discovery period of statutes, as forgoing any three-year cap on damages, see the matter of Warner Chappel Music v. Sherman Nealy.

## VII.   DEMAND FOR JURY TRIAL

**Plaintiff hereby requests a jury trial on all issues raised in this complaint.**

## VIII.  EXHIBITS

Exhibit A     WGA Registrations, Copyright Certificate, and Copyright Office emails

Exhibit B     TajMania Entertainment Contract, Penguin Group Letter

Exhibit C     Infringement Examples - Movies

Exhibit D     Infringement Examples - Episodes

Exhibit E     Publicity Rights / Invasion of Privacy Rights Examples

Dated this 25th day of May, 2025

_____/s/_____

Alethea O'Toole, Plaintiff in Pro Se